AO-106 (Rev: 06/09)-Application for Search Warrant

# UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

*FILED*

NOV 1 0 2022

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

| In the Matter of the Search of | ) | |
| *Green iPhone in a Clear Case, Currently Stored at the* | ) | Case No. 22-MJ-747-CDL |
| *DEA Tulsa Resident Office* | ) | |
| | ) | **FILED UNDER SEAL** |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the ___Northern___ District of ___Oklahoma___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
| --- | --- |
| **21 U.S.C. §§ 846 and 841(a)** | **Conspiracy to Distribute and Conspiracy to Possess with Intent to Distribute Cocaine** |

The application is based on these facts:
**See Affidavit of SA Taylor Wilson, DEA, attached hereto.**

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Taylor Wilson, DEA
*Printed name and title*

Sworn to before me via phone.

Date: __November 10, 2022__

City and state: __Tulsa, Oklahoma__

_____
*Judge's signature*

Christine D. Little, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In the Matter of the Search of a Green iPhone in a Clear Case, Currently Stored at the DEA Tulsa Resident Office | Case No. _____<br><br>**FILED UNDER SEAL** |

**Affidavit in Support of an Application
Under Rule 41 for a Warrant to Search and Seize**

Taylor Wilson, being duly sworn under oath, states as follows:

**Introduction and Agent Background**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws and I am within the category of officers authorized by the Attorney General to request such a warrant.

3. I am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice. I have been a DEA Special Agent since March 2016. I am currently assigned to the Tulsa Resident Office (TRO), in Tulsa, Oklahoma, and I am an "investigative or law enforcement officer" of the United

States as defined in 18 U.S.C. § 2510(7). I was previously employed with Customs and Border Protection (CBP), Department of Homeland Security. I worked as a CBP Officer for approximately two years. During my law enforcement career, I have received over 1,500 hours in specialized training from various federal law enforcement agencies. This training has focused upon methods of unlawful manufacturing of illegal narcotics via clandestine laboratories, the installation and monitoring of global positioning satellite (GPS) trackers, Title III wire interceptions, smuggling and distribution techniques, methods of drug trafficking, as well as the means by which drug traffickers derive, launder and conceal their profits from drug trafficking, the use of assets to facilitate unlawful drug trafficking activity and the law permitting the forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate the drug violations. I have gained a considerable amount of knowledge about drug trafficking organizations and their members through my training and experience. During the course of my training and interviews with various defendants I have learned how individuals involved in drug distribution schemes maintain records and conspire to deceive law enforcement as well as rival distributors of controlled dangerous substances. I have learned how individuals who are involved in the distribution of controlled dangerous substances maintain records and secret monies derived from the sale of illegal drugs.

4. Based on my experience as a law enforcement officer, I also know that those involved in international drug trafficking rely heavily on telephones to communicate with one another in order to coordinate the smuggling, transportation, and

2

distribution of illegal drugs, and that they frequently employ coded language and slang terminology in an effort to maintain secrecy while engaging in such communications.

5. Through my employment as a law enforcement officer, I have gained knowledge in the use of various investigative techniques, including the use of wire interceptions and other types of electronic surveillance, physical surveillance, undercover investigators, confidential informants, cooperating witnesses, controlled purchases of illegal drugs, consensually-monitored recordings, investigative interviews, trash searches, mail covers, financial investigations, administrative and grand jury subpoenas, and search and arrest warrants. I have also trained Special Agents within the DEA.

6. I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, conversations with others who have personal knowledge of the events and circumstances described herein, and a review of open-source information including information available on the Internet. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact I or others have learned during the course of this investigation.

7. Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of violations of Title 21, United States

3

Code, Sections 846 and 841(a) – Conspiracy to Distribute and Conspiracy to Possess

with Intent to Distribute Cocaine, will be located in the electronically stored

information described in Attachment B and is recorded on the devices described in

Attachment A.

### Identification of the Devices to be Examined

8. The property to be searched is:

    a.  A Green iPhone in a Clear Case (IMEI: Unknown)

 

hereinafter the "Devices." The Devices are currently located at the DEA Tulsa

Resident Office (TRO) in the Northern District of Oklahoma.

9. The applied-for warrant would authorize the forensic examination of the

Devices for the purpose of identifying electronically stored data particularly

described in Attachment B.

**Probable Cause**

10. In approximately January 2020, members of the DEA TRO, the TPD, and the DEA Oklahoma City District Office (OCDO) began investigating a drug trafficking organization (DTO) distributing cocaine in Tulsa, Oklahoma, and other parts of the United States.

11. In September 2021, members of the DEA TRO and the TPD began investigating the drug trafficking activities of Christian Ramirez. Investigators have identified Ramirez to use telephone number 918-693-0190 (Target Telephone #1) and to sell cocaine and methamphetamine from his residence, located at 236 South 120th East Avenue, Tulsa, Oklahoma.

12. On June 24, 2022, United States District Judge Claire V. Eagan, Northern District of Oklahoma (NDOK), signed an order authorizing the interception of wire and electronic communications on Target Telephone #1, which is known to be used by Christian Ramirez.

13. On July 22, 2022, United States District Judge Claire V. Eagan, NDOK, signed an extension authorizing the continued interception of wire and electronic communications on Target Telephone #1, which is known to be used by Christian Ramirez.

14. On August 19, 2022, United States District Judge Claire V. Eagan, NDOK, signed an extension authorizing the continued interception of wire and electronic communications on Target Telephone #1, which is known to be used by Christian

Ramirez. The interception of Target Telephone #1 will terminate on September 17, 2022.

15. On August 31, 2022, at approximately 8:28 a.m., Ramirez, on Target Telephone #1, called FNU LNU (a/k/a "Rayo," a/k/a "UM1314"), at Mexico-based telephone number 52-614-539-1314. During this call, Ramirez and Rayo greeted. Ramirez told Rayo he wanted to let Rayo know he (Ramirez) was going to leave the money with his guy. Rayo said perfect and that Rayo would call and tell them to leave right away. Ramirez said okay and asked Rayo if it would be the same. Rayo said he was calculating and then said 47. Ramirez asked if 47. Rayo said yes. Ramirez said okay and the 3 bucks he would leave it to see what they would do with it. Rayo said yes and the other 3 would need to be given to his cousin and that Rayo would call him to U/I. Ramirez said okay and for Rayo to holler at Ramirez when the guys were ready to send him.

16. Based on my training and experience and my knowledge of this investigation, during the call described above, I believe Ramirez called Rayo to tell him that he would be delivering the drug proceeds to Francisco Javier Sarmiento ("his guy"). Rayo said he could contact the couriers ("them"), that would be delivering Ramirez and Sarmiento cocaine, and tell them to leave immediately for Tulsa. Rayo directed Ramirez to give the couriers $47,000 ("47") U.S. currency. Ramirez and Rayo agreed for Ramirez to give the remaining $3,000 ("3") U.S. currency to Rayo's cousin, Jose Reyes Alvarez. I believe Ramirez and Sarmiento would be receiving two

kilograms of cocaine in exchange for $50,000 ($25,000 per kilogram of cocaine) from Rayo's couriers.

17. At approximately 3:35 p.m., Ramirez, on Target Telephone #1, received a call from Rayo at Mexico-based telephone number 52-614-539-1314. During this call, Rayo asked Ramirez for the address, because he no longer had it, as he had erased it. Ramirez told Rayo that he was going to check with the guy to see where he wanted to meet them because he thought he wanted to meet them at another location, like on 15th and Sheridan. Ramirez said he would call the guy really quick. Rayo said that they had confirmed to him that they would be at the point at 5:30. Ramirez said okay, that is fine. Rayo said okay.

18. Based on my training and experience and my knowledge of this investigation, during the call described above, I believe Rayo called Ramirez to direct Ramirez to send him the address of where Sarmiento would like to meet the couriers. Ramirez advised Rayo he would ask Sarmiento the location of where he would like to meet. Additionally, Rayo advised Ramirez that the couriers would arrive to Tulsa ("the point") at approximately 5:30 p.m.

19. At approximately 3:36 p.m., Ramirez, on Target Telephone #1, called Sarmiento, at telephone number 918-406-7478. During this call, Ramirez told Sarmiento 5:30. Sarmiento said okay. Ramirez told Sarmiento to swing by the house at 5:00. Ramirez said he believed that it was going to be at the same place as the other time. Sarmiento said okay, that at 5:00 he would meet him there. Ramirez said okay.

7

20. Based on my training and experience and my knowledge of this investigation, during the call described above, Ramirez directed Sarmiento to arrive to his (Ramirez) residence at 5:00 p.m. because the couriers would be arriving at approximately 5:30 p.m.

21. At approximately 4:50 p.m., investigators observed Sarmiento depart from his residence, located at 7136 East 13th Street, Tulsa, Oklahoma, driving his maroon Chevrolet Suburban bearing Oklahoma tag LFS137. Investigators observed Sarmiento arrive to Ramirez's residence, located at 236 South 120th East Avenue, at approximately 5:03 p.m. Upon Sarmiento's arrival, investigators observed Sarmiento exit his vehicle carrying a box under his arm. Sarmiento proceeded to enter into Ramirez's open garage door.

22. At approximately 5:40 p.m., Ramirez, on Target Telephone #1, called Rayo at Mexico-based telephone number 52-614-539-1314. During this call, Rayo said that the guys would be there in exactly 35 minutes. Ramirez asked Rayo if everything was good and if they had not gotten held up for anything else. Rayo said everything was good. Rayo said they were in a black Ram Dually. Ramirez told Rayo to tell the guy to park, and they were close. Rayo said okay. Ramirez asked what the color was. Rayo said black Ram of double...(call disconnected).

23. Based on my training and experience and my knowledge of this investigation, during the call described above, I believe Rayo advised Ramirez that the couriers would arrive to the designated meet location in approximately 35 minutes.

Additionally, Rayo told Ramirez that the couriers would be in a black Dodge Ram Dually truck.

24. At approximately 6:09 p.m., Ramirez, on Target Telephone #1, received a call from Rayo, at Mexico-based telephone number 52-614-539-1314. During this call, Rayo said they would be there in 15 minutes. Rayo told Ramirez that he sent him the number. Rayo asked Ramirez to call them. Ramirez told Rayo not to send him his number. Rayo said that he sent Ramirez their number, the number for them. Ramirez said okay. Ramirez told Rayo that he saw it, and would call from the other. Rayo said that he sent the number to this phone, through message. Ramirez said yes, he saw it now. Ramirez said he would call soon. Rayo said okay.

25. Based on my training and experience and my knowledge of this investigation, during the call described above, I believe Rayo advised Ramirez that the couriers would arrive to the designated meet location in approximately 15 minutes. Rayo then told Ramirez that he (Rayo) had sent him (Ramirez) the courier's telephone number. Ramirez stated he would call the couriers from a different telephone.

26. At approximately 6:24 p.m., investigators observed Sarmiento exit Ramirez's garage carrying a box. Investigators observed Sarmiento place the box in the back seat, on the driver's side, of his maroon Chevrolet Suburban. Sarmiento proceeded to enter into the driver's seat of his vehicle and depart from Ramirez's residence.

27. At approximately 6:33 p.m., investigators observed Sarmiento arrive to Pancho Anaya, located 212 South Garnett Road, Tulsa, Oklahoma. Upon arrival, investigators observed Sarmiento park his maroon Chevrolet Suburban next to a

black Dodge Dually that was backed into a parking spot on the east side of the building. At this time, investigators observed a Hispanic male wearing a lime green shirt, later identified as Julio Cesar Olivas Jr., exit the driver's seat of the black Dodge Dually carrying a black bag. Olivas walked to the passenger side of his truck and met with Sarmiento. At approximately 6:35 p.m., investigators observed Olivas enter back into the driver's seat of his truck. At that time, investigators observed Sarmiento to depart from the parking lot in his maroon Chevrolet Suburban. Investigators observed Sarmiento to return to Ramirez's residence upon his departure from Pancho Anaya. At approximately 6:37 p.m., investigators observed the black Dodge Dually depart from the Pancho Anaya parking lot. Upon the black Dodge Dually's departure, investigators observed the black Dodge Dually to bear Oklahoma tag 96813V. This vehicle is registered to Laura Gonzalez at 1032 SW 51st Street, Oklahoma City, Oklahoma. Investigators maintained surveillance on the black Dodge Dually and observed it to travel eastbound on the Turner Turnpike towards Oklahoma City, Oklahoma.

28. At approximately 6:36 p.m., Ramirez, on Target Telephone #1, received a call from Rayo, at Mexico-based telephone number 52-614-539-1314. During this call, Ramirez told Rayo that the guy (Sarmiento) was there with them. Rayo said okay. Rayo told Ramirez that they should set a deal up for the future for when Ramirez would need some so that they would have time and not have to mess with the going around. Ramirez told Rayo that he had told Rayo two weeks ago. Ramirez told Rayo that he would let Rayo know when he had a half. Rayo said yes. Ramirez

told Rayo that he would give Rayo a holler later. Ramirez said that if everything went well, he would call Rayo's cousin. Ramirez told Rayo that his cousin called. Rayo said that there was one there in the "P" also. Ramirez said he would see how they came out first. Ramirez said that a guy was going to get a half. Ramirez told Rayo that he would see how he was doing, and that he hopefully got the other one sometime soon. Rayo said perfect. Ramirez said bet.

29. Based on my training and experience and my knowledge of this investigation, during the call described above, I believe Ramirez advised Rayo that Sarmiento was currently meeting with the couriers. Rayo and Ramirez then discussed future cocaine transactions.

30. At approximately 6:50 p.m., Ramirez, on Target Telephone #1, called Rayo, at Mexico-based telephone number 52-614-539-1314. During this call, Ramirez said they arrived and they were cool; however, each weighed 965 and 966. Rayo said oh shit. Ramirez said yes, one weighed 965 and the other 966. Rayo said that he would check that out. Ramirez said one was missing 35 and the other one was missing 34, but they were bad ass. Rayo told Ramirez that he was talking to the guy. Rayo said that the guy was one of the first ones that Rayo started with. Rayo asked Ramirez if he remembered. Ramirez said yes. Rayo said that the guy had up to four. Rayo said that Ramirez could get four weekly or bi-weekly from them. Rayo said that they could send four, he just had to pay three, and one would be loaned. Ramirez said okay, but he needed to see how things went for him. Ramirez said it was good for the nose. Ramirez said that he had to check because his buddy used it for...Ramirez said

11

that was what the black people did. Ramirez said that the problem right now was the weight. Ramirez said one was off by 35, and the other was off by 34. Ramirez said it was 69. Ramirez said that was almost two and a half. Rayo said he would let him know. Ramirez said that the guy was there right now, and he had to get right with him now. Ramirez said that he would want to take some from that. Rayo said that he would talk to the guy. Ramirez said okay.

31. Based on my training and experience and my knowledge of this investigation, during the call described above, I believe Ramirez called Rayo to advise him that he had received two kilograms of cocaine; however, each kilogram was light on weight. Ramirez explained to Rayo that one kilogram of cocaine he had received weighed 965 grams and the other kilogram weighed 966 grams, which left him short 69 grams of cocaine. Ramirez explained that the quality of the cocaine was good ("bad ass"), but he was short weight. Rayo advised he would contact "the guy" to find a solution.

32. At approximately 8:40 p.m., Oklahoma Highway Patrol (OHP) Trooper Jake Sawatzky executed a probable cause traffic stop on the black Dodge Dually on I-35 southbound at Wilshire in Oklahoma City, Oklahoma. The probable cause for the traffic stop was that the black Dodge Dually bore a license plate that returned to a commercial motor vehicle (improper license plate display). During the traffic stop, OHP Trooper Sawatzky identified the driver as Olivas and the two passengers as Abraham Medina and Jonathan Medina. While OHP Trooper Sawatzky issued Olivas a courtesy warning, OHP Trooper Brady Webb deployed his narcotics certified K-9 Outlaw for a free air sniff of the black Dodge Dually. OHP Trooper

Webb identified K-9 Outlaw to give a positive alert and indication to the black

Dodge Dually for the presence of narcotics. During a probable cause search of the

vehicle, OHP Troopers located a box in the backseat floorboard, which contained

$47,000 U.S. currency. The U.S. currency was packaged in bundles held together by

rubber bands. Additionally, OHP Troopers located a scale, which contained

suspected cocaine residue, and numerous plastic baggies. During the traffic stop,

OHP Troopers located three cellular telephones (a black Samsung cell phone, a blue

iPhone, and an iPhone in a black case with stickers on it). Upon locating the $47,000

U.S. currency, OHP Troopers transported Olivas, A. Medina, and J. Medina to

OHP Headquarters in Oklahoma City for processing of the U.S. currency.

33. Your affiant and SA Nick Sanders responded to the OHP Headquarters in

Oklahoma City in order to conduct interviews of Olivas, A. Medina, and J. Medina.

At the OHP Headquarters, SA Sanders and I met with Olivas. At that time, I read

Olivas his Miranda warning in English. Olivas stated he understood his rights and

would like to speak with investigators. During the interview, Olivas identified the

black Samsung cell phone and the blue iPhone to be his telephones. Olivas identified

the black Samsung cell phone to be assigned telephone number 480-826-1678 and the

blue iPhone to be assigned telephone number 405-551-0369. Investigators explained

to Olivas that OHP Troopers had located a box, which contained $47,000 U.S.

currency. Olivas stated the money did not belong to him. Investigators asked where

Olivas obtained the $47,000 U.S. currency and Olivas stated an individual known as

"Arab" directed him to travel to Tulsa to pick-up money. Olivas stated he picked up

13

the money in downtown Tulsa near the BOK Center. Olivas said a Hispanic male

driving a black Chevrolet Silverado delivered him the box containing the $47,000

U.S. currency. Olivas identified "Arab's" telephone number as 52-614-539-1314.

This number is known to investigators to be used by Jesus Omar Morales-Delgado

(a/k/a "Rayo," a/k/a "UM1314"). During this interview, investigators identified

Olivas to not be telling investigators the full truth, so investigators terminated the

interview.

34. During the interview with A. Medina, I read A. Medina his Miranda warning

in English. A. Medina stated he understood his rights and would like to speak with

investigators. A. Medina told investigators that he met Olivas approximately two

months ago, through a soccer team on which they both played. A. Medina advised

that they hang out together on occasion. A. Medina told investigators that Olivas

asked if A. Medina and his cousin, J. Medina, wanted to go with him to Tulsa. A.

Medina said that all three individuals went to Tulsa, so Olivas could meet with

someone. A. Medina advised they arrived in Tulsa and went to a "Panderia" bakery

warehouse. A. Medina stated he and his cousin, J. Medina, walked to a gas station

that was next door to the bakery. A. Medina said he was unaware what Olivas did,

or who he met while they were gone. Olivas explained that when he and J. Medina

returned they got in Olivas's truck and returned to Oklahoma City. Investigators

advised A. Medina that OHP Troopers had seized a box containing $47,000 from the

truck. A. Medina stated the $47,000 U.S. currency wasn't his, but he wished it was.

14

35. During the interview with J. Medina, I read J. Medina his Miranda warning in English. J. Medina stated he understood his rights and would like to speak with investigators. J. Medina identified the iPhone in the black case with stickers on it to belong to him. Additionally, J. Medina identified the iPhone in the black case with stickers on it to be assigned telephone number 405-474-1049. J. Medina explained that he met Olivas through his cousin A. Medina. Investigators asked J. Medina to explain to them what all J. Medina did that day leading up to the traffic stop by OHP Troopers. J. Medina stated that he woke up at a hotel in Houston, Texas. J. Medina explained he, A. Medina, and Olivas departed from Houston at approximately 9:00 a.m. or 10:00 a.m. that morning (August 31, 2022). J. Medina continued to explain that they then drove to Tulsa and went to a Mexican bakery warehouse that was located off a street that started with a "G." J. Medina advised that Olivas said he had to pick up something in Tulsa. J. Medina said upon arrival to the Mexican bakery warehouse, Olivas exited the truck and A. Medina drove them (A. Medina and J. Medina) to a nearby gas station. J. Medina stated that upon A. Medina and J. Medina's return to the Mexican bakery warehouse, Olivas entered back into the truck and they returned to Oklahoma City.

36. On October 20, 2022, an arrest warrant was issued in the Northern District of Oklahoma (NDOK) for A. Medina following his indictment by a federal grand jury for Drug Conspiracy.

37. On October 25, 2022, members of the DEA Oklahoma City District Office (OCDO) established surveillance in the area of A. Medina's residence, located at

1402 SW 59th Street, Oklahoma City, Oklahoma. At approximately 9:30 a.m.,

members of the OCDO approached apartment 5129 where investigators knocked on

the door and announced "Police." After a brief period of time, the door opened and

investigators immediately recognized A. Medina as the individual who answered the

door. Investigators immediately took A. Medina into custody without incident.

Upon A. Medina's arrest, A. Medina advised he wanted to collect his shoes and a

jacket before departing the apartment. A. Medina granted investigators with

permission to enter the apartment. A. Medina indicated he was sleeping on the

couch, which was evident by investigators collecting A. Medina's shoes, jacket and

**green iPhone in a clear case**. At that time, investigators seized A. Medina's

telephone for evidentiary purposes.

### Technical Terms

38. Based on my training and experience, I use the following technical terms to

convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from

the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or

notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

39. Based on my training, experience, and research, I know that the devices have capabilities that allow each to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

18

### Electronic Storage and Forensic Analysis

40. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

41. I know that cellular telephones are often equipped with digital cameras and those phones possess the capability to transmit and/or store electronic images. I know that in many cases, cellular telephones maintain photographs of illegal activities to include evidence of illegal drug trafficking. These photos are sometimes stored in their cellular phones and often are transmitted or sent from one electronic media device to another. I also know that cellular phones may also contain notes regarding potential illegal acts that are recorded by the subject who possesses the electronics. Furthermore, I know that text messages, emails are often used by two or more persons to communicate information regarding illegal activities, between principals and co-conspirators of those crimes.

42. I know that cellular telephones are utilized by the majority of individuals in the United States and have become a staple of communication between individuals using text messaging, visual and audible communications (telephone calls and FaceTime type communications) as well as applications like "Whatsapp" and "GroupMe." Additionally, individuals utilize their cellular devices to take pictures, keep notes, as a GPS (global positioning System) device, and even to conduct illicit or illegal activity. Communications on phones are kept for long periods and

19

transferred from one phone to another when replaced. This is done through the use of Cloud storage and direct transfer conducted at the time of purchase or by the individual themselves. Individuals utilize this method as not to lose data that is stored on the phone such as contacts, photos, notes, and other important information to the individual. This data includes contacts used to conduct illegal activities to include drug trafficking.

43. Based on my education, training, and experience, I know that individuals involved in the use, sales, manufacturing, and transportation of illegal narcotics often use cell phones and other electronic devices to further their trade by conducting business on them via text messages and phone calls. I also know from my training, education, and experience that:

a. Drug distributors/traffickers commonly maintain books, records, receipts, notes, ledgers, and other documents/papers both electronically and in paper form, which relate to the transportation, ordering, sale, and distribution of controlled substances, even though such documents may be in code and/or identify customers/sources/co-conspirators through monikers/nicknames. Documentation such as this oftentimes results because drug distributors/traffickers commonly "front" drugs (provide controlled substances on consignment) to their clients and must account for these transactions in order to collect outstanding drug debts.

b. Drug distributors/traffickers commonly maintain addresses or telephone numbers in notebooks, papers, cellular phones, computers and electronic storage media which reflect names, address, and/or telephone numbers for their associates in the drug distribution/trafficking organization, even if said items may be in code, and such traffickers send and receive items listed in this affidavit by mail and other common carriers.

c. Drug users, distributors and traffickers frequently take, or cause to be taken photographs or videotapes of themselves, their associates, their property/assets, and their product, and these individuals usually maintain these photographs or recordings/videos in the residences under their

control. These photographs and videos are also often found in the individual's cellular telephone, computers and other electronic storage media.

d. I have participated in numerous searches of cellular telephones found to be in the possession of drug users/dealers/traffickers where text messages were discovered discussing topics such as quantities, prices and the quality of controlled dangerous substances, as well as dates, times and locations for drug transactions are discussed. Almost always, these communications are in coded drug talk/jargon and require review by peace officers experienced in deciphering such communications.

e. In my experience in searching cellular telephones possessed by known drug users/distributors/traffickers, photos and/or videos have been discovered which evidence the use and distribution of controlled dangerous substances and the proceeds intended for or derived therefrom. Commonly said evidence depicts pictures/videos of drugs for evidencing the respective drugs quality, condition or quantity. Moreover, users will commonly document episodes of drug use in social settings. Additionally, drug distributors will take pictures ("trophy" pictures) or otherwise capture digital recordings for the purpose of memorializing their credibility/capability as a drug dealer and accomplishments (acquisition of assets/large amounts of U.S. currency) relating thereto.

f. Cellular telephones are often used to facilitate offenses and allow criminals to maintain communication with each other before, during and after the commission of offenses. I am aware that cellular telephones have the capacity to store a vast amount of information, including but not limited to: telephone numbers, voice messages, text messages, e-mail, photographs, videos, address books, records, phone call histories, contact and other information. This information may be contained on the cellular telephone.

g. Text messages and e-mails are often used by two or more persons to communicate information regarding illegal activities between two telephones or between one telephone and a personal computer. This information can include directions for deliveries, stash locations, prices, cell phone contact numbers, and instructions.

h. Cellular telephones often contain stored phone numbers and contact information of individuals that conduct business with other co-conspirators that possess the cellular telephone.

i.   When drug users/dealers/traffickers use text messages to discuss topics such as quantities, prices, and the quality of controlled dangerous substances, as well as dates, times and locations for drug transactions, these communications are often in coded drug talk/jargon and require review by peace officers experienced in deciphering such communications.

j.   In my experience in searching cellular telephones possessed by known drug users/distributors/traffickers, photos and/or videos have been discovered which evidence the use and distribution of controlled dangerous substances and the proceeds intended for or derived therefrom. This evidence often depicts pictures/videos of drugs for showing drug quality, condition or quantity. Moreover, users will commonly document episodes of drug use in social settings. Additionally, drug distributors will take pictures ("trophy" pictures) or otherwise capture digital recordings for the purpose of memorializing their credibility/capability as a drug dealer and accomplishments (acquisition of assets/large amounts of U.S. currency) relating thereto.

k.   In all phases of drug distribution, the utilization of cellular telephones is essential. Drug users/dealers/traffickers use cellular telephones to place calls, as well as communicate by SMS text messaging. As drug dealing necessarily entails constant communications with accomplices, co-conspirators, clients, and sources, these communications virtually always take place by voice calls and text messaging over cellular telephones.

l.   Cellular telephones are almost always used by drug distributors as a way to communicate. They will communicate by verbal conversations, digital text messaging, and/or sending photographs to one another. To avoid detection, drug distributors will oftentimes speak in coded language or through use of vague messages. Sometimes the cellular telephone numbers they use are listed in a different individual's name or they will frequently change phone numbers. Drug distributors will often "drop" or switch cellular phones to avoid detection by law enforcement. This will result in the accumulation of several different cellular phones.

41.  *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of use, who used each, and

when. There is probable cause to believe that this forensic electronic evidence might

be on the Devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f. I know that when an individual uses an electronic device as a communication device or a device to obtain information from the Internet related to a criminal act, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

23

42. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

43. *Manner of execution*. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

44. *Methods of examination*. In conducting this examination, law enforcement personnel may use various methods to locate evidence and instrumentalities of the crime(s) under investigation, including but not limited to undertaking a cursory inspection of all information within the Devices. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with stored cellular device data, such as pictures and videos, do not store as searchable text. Moreover, even as to text data,

24

keyword searches cannot be relied upon to capture all relevant communications associated with a cellular device, as it is impossible to know in advance all of the unique words or phrases investigative subjects will use in their communications. Consequently, often many communications in cellular device data that are relevant to an investigation do not contain any searched keywords.

### Conclusion

45. Based on the information above, I submit that there is probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

46. I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

Taylor Wilson
DEA Special Agent

by phone

Subscribed and sworn ~~before~~ me on this 10th day of November 2022.

Christine D. Little
United States Magistrate
Northern District of Oklahoma

25

## ATTACHMENT A

### Property to be Searched

The property to be searched is:

    a.  Green iPhone in a Clear Case (IMEI: Unknown)



Currently Stored at the DEA Tulsa Resident Office (TRO) in the Northern District of Oklahoma. This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

### Particular Things to be Seized

All records on the Devices described in Attachment A that relate to violations of Title 21, United States Code, Sections 846 and 841(a) – Conspiracy to Distribute and Conspiracy to Possess with Intent to Distribute Cocaine.

1. Records relating to communication with others as to the criminal offense(s) listed above; including incoming and outgoing voice messages; text messages; emails; multimedia messages; applications that serve to allow parties to communicate; all call logs; secondary phone number accounts, including those derived from Skype, Line 2, Google Voice, and other applications that can assign roaming phone numbers; and other Internet-based communication media;

2. Records relating to documentation or memorialization of the criminal offense(s) listed above, including voice memos, photographs, videos, and other audio and video media, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos, including device information, geotagging information, and information about the creation date of the audio and video media;

3. Records relating to the planning and execution of the criminal offense(s) above, including Internet activity, firewall logs, caches, browser history, and cookies, "bookmarked" or "favorite" web pages, search terms that the user

entered into any Internet search engine, records of user-typed web addresses, account information, settings, and saved usage information;

4. Application data relating to the criminal offense(s) above;

5. Lists of customers and related identifying information;

6. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

7. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information); and

8. All bank records, checks, credit card bills, account information, and other financial records.

9. Evidence of user attribution showing who used or owned the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, saved usernames and passwords, documents, and browsing history;

10. All records and information related to the geolocation of the Device(s);

11. All records and information related to the coordination, agreement, collaboration, and concerted effort of and with others to violate the criminal statutes listed above.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2